IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL WILLIAM JENSEN,<br><br>                Plaintiff,<br><br>  vs.<br><br>M.E. KNOWLES, Warden, et al.,<br><br>                Defendants. | Case No. CIV S-01-0723 (JKS)<br><br><u>O R D E R</u> |

    Plaintiff Paul Jensen brings this action under 42 U.S.C. § 1983, alleging that Defendants violated his various constitutional rights while he was incarcerated at Mule Creek State Prison in Ione, California. Two matters have been pending for some time. First, the State moves for summary judgment; a motion Jensen opposes. See Docket Nos. 73 (Mot.); 74 (Def. stmt. of undisp. facts); 75 (Opp'n). Second, Jensen moves to consolidate this case with another case, Jensen v. Knowles, et al., CIV S-02-2373 (E.D. Cal. Oct. 29, 2002), which is also before this Court. See Docket Nos. 77 (Mot.); 78 (Opp'n); 79 (Reply). This Court has jurisdiction. 28 U.S.C. §§ 1331, 1343.

**FACTUAL AND PROCEDURAL BACKGROUND**

    Jensen's allegations are, at best, difficult to parse through. His complaint is a long summary of conclusory legalistic language alleging various constitutional wrongs committed against him by

1

staff at Mule Creek State Prison ("MCSP"). Nonetheless, the Court has endeavored to summarize the factual allegations leading to the current dispute. While the following facts will be taken as true for purposes of this motion, the majority of them are taken from the exhibits accompanying Defendants' Statement of Undisputed Facts. See Docket No. 74. The Court has taken care to determine which facts Jensen disputes, but this task is made difficult due to the, at times, convoluted nature of Jensen's filings.[1]

The genesis of this suit is Jensen's May 30, 2000, arrival at MCSP from a substance abuse facility in Corcoran, California. Docket No. 75 at 2. Upon his arrival at MCSP's Receiving and Release ("R&R") Facility, Jensen was apparently notified that he was going to be housed with an inmate who smoked. Id. at 3–4. Because he has various pulmonary ailments, Jensen objected and refused to proceed to the assigned housing facility. Id. at 3. Various officers were called to the R&R Facility in response to Jensen's refusal. Defendant Lt. M. Laguna told Jensen that he was unable to locate any medical files documenting Jensen's pulmonary problems and justifying special housing needs. Docket No. 74, Ex. C, Att. 1 at 15.

Jensen's response to the situation led to the allegations eventually culminating in this suit. According to Defendants,

---

[1] Jensen's "oppositions" are usually nothing more than copies of Defendants' filings. Jensen will then white-out paragraphs, sentences, or words with which he disagrees and hand-write his version of the facts. His opposition to Defendants' motion for summary judgment is his amendment of Defendants' preliminary statement of issues. He includes no exhibits with his opposition to support his allegations. Nonetheless, the Court has strived to give his claims the broad reading they are entitled pursuant to Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987).

ORDER

C:\WINDOWS\Temp\notes101AA1\~7902209.wpd

Jensen became irritated and told guards that they would "have to lock [him] up, because I'm not going to house with anyone that smokes." Id. Jensen then became "boisterous and started flailing his arms." Id. Jensen does not dispute these allegations other than to admit that he was "complaining vehemently." Docket No. 75 at 3. Laguna told officers to place Jensen back into a R&R holding cell pending Laguna's further review of Jensen's housing needs. Docket No. 74, Ex. C, Att. 1 at 15. After the remainder of the arriving prisoners were housed, Laguna determined that there was an empty cell in Building 3, which was apparently in Facility A. Id. at 16. Laguna called Facility A staff to inform them that Jensen was cleared to be housed in single-cell status for the night. Id.

Defendant Officer T. Remaley arrived at the R&R Facility to escort Jensen and four other prisoners to Facility A. Id. at 17. When Remaley asked Jensen to exit the R&R holding cell, Jensen refused, stating that he wanted to know who his cell mate was going to be and asking what had happened to his property.[2] Id. Remaley ordered Jensen out of the holding cell. Id. at 17. Jensen initially complied with Remaley's order. Id. However, when Remaley informed Jensen that Jensen would receive his property at a later time and that Remaley did not know who Jensen's cell mate would be, Jensen became argumentative with Remaley and attempted to "brush past" Remaley on two different occasions. Id. Jensen demanded that he be sent to administrative segregation. Id.

---

[2] Because the officer in charge of processing incoming inmates' property, Officer B. Grooms, thought Jensen was going to administrative segregation per Jensen's demands, he had not processed Jensen's property. Docket No. 74, Ex. C, Att. 1 at 11. Thus, it was not ready to accompany Jensen to Facility A. Id.

ORDER

C:\WINDOWS\Temp\notes101AA1\~7902309.wpd

At that point, Remaley decided to handcuff Jensen. In a June 6, 2000, memorandum describing the events of May 30, Remaley wrote:

> I stepped in front of Jensen and told him that he was not going back into R&R, and that he was going to building 3. Jensen became argumentitive [sic], repeated his demands to go to ad-seg an[d] again attempted to brush past myself and Officer T. Nelson. I felt it nessecary [sic] to cuff up Jensen for staff saf[e]ty and to not let the sititutatuon [sic] get out of control. Due to Jensen's close proximity to myself I informed him that he needed to turn around and placed him in mechanical restraints, he did not resist. I escorted Jensen to building 3 and placed him into the lower B shower. I left him in the restraints while building 3 staff processed him and prepared his cell A3-147.

Id. Once Jensen's cell was ready, Remaley escorted Jensen to the cell, removed the restraints, and secured the door. Id. Jensen's opposition to Defendants' motion for summary judgment does not dispute Remaley's version of events other than to claim that Remaley used "excessive force." Docket No. 75 at 3.

Laguna was called back to Building 3 while Jensen was handcuffed in the shower waiting for guards to prepare his cell. Laguna claims that Jensen was verbally abusive to staff, yelling loudly at guards and other inmates, and threatening guards with "problems" if they did not house him with a non-smoker. Docket No. 74, Ex. C, Att. 1 at 16. Laguna explained to Jensen that he would be single-celled for the evening and that he could request single-cell status the next morning. Id. Jensen was "unreceptive" to requesting single-cell status in the morning and continued to be "disrespectful and disruptive." Id. Therefore Laguna left him in restraints until his cell was ready and supervised Jensen's subsequent placement in his cell. Id. Jensen admits that he continued to yell and argue with officers and that he complained loudly when he was escorted to his cell. Docket No. 75 at 4.

ORDER

Jensen claims that he told Laguna that Remaley used excessive force and that Laguna ignored his claims. Id.

The following day Jensen filed an administrative grievance, complaining that Officers Ayala and Grooms failed to give him his property, that Remaley assaulted him, and that Laguna and another officer, L. Retzlaff, failed to "act in a responsible manner." Docket No. 74, Ex. A, Att. 1 at 55. In response on June 1, 2000, Warden R.Q. Hickman ordered staff to review Jensen's claims and to tape their interview with Jensen. Id. at 68. A subsequent medical examination on June 7, 2000, revealed seven contusions of unknown origin on Jensen's arms. Id., Ex. B, Att. 1 at 4. Defendant Dr. Bulanon treated the bruises with first aid and told Jensen to return if he had any further disabilities. Id. at 3.

On the same day, Jensen was interviewed by Defendant Lt. D. Brown. Id., Ex. C, Att. 1 at 9. In a memorandum summarizing the interview, Brown stated that Jensen was evasive about how he obtained the bruises. Id. However, according to Brown, Jensen "made inferences that he may have been beaten at the hands of staff on May 30, 2000 while being escorted from [R&R] and the Facility A gate." Id. Jensen also apparently inferred that the beating was retaliation for a prior lawsuit he filed against certain correctional officers at MCSP. Id. Because Jensen would not talk with Brown about who caused the bruising, Jensen was placed in administrative segregation to protect him "from an imminent and immediate threat to his own personal safety by unknown person(s)." Id.

Jensen disputes the State's accounting of the above events. He claims that Defendant Sgt. R. Carrillo visited him on June 7

prior to Jensen's medical evaluation and his interview with Brown. Docket No. 75 at 5.  He claims that Carrillo told him that if Jensen did not mention Remaley's name in connection with the alleged assault or if Jensen signed a waiver, then Jensen would not be placed in administrative segregation and maybe "they could forget about 'the whole thing.'"  Id.  Jensen claims that this is the reason that he did not mention Remaley's name in both the medical evaluation as well as the subsequent interview with Brown; an interview that Carrillo apparently attended as well.  Jensen also claims that after Brown notified Jensen that Jensen was going to go to administrative segregation for his safety, Jensen then informed Brown that it was Remaley that caused his injuries but Brown refused to change his report to reflect the new information.  Id. at 6.  Jensen also alleges that after his medical examination was over, Jensen told Dr. Bulanon "off the record" that Remaley had caused his injuries.  Id.  As a result, Dr. Bulanon listed the cause of the bruising as unknown.  Id.  Related to this visit, on June 20 Jensen filed another grievance complaining that when he tried to have the medical report amended to reflect the fact that Remaley had caused the bruising, Dr. Bulanon refused.  Docket No. 74, Ex. A, Att. 1 at 84–85.  The grievance also complained that the prison form prepared by Brown was similarly flawed and that Brown refused to amend it.  Id.  The grievance was denied.

Jensen was placed in administrative segregation shortly after the initial interview with Brown.  See Docket No. 74, Ex. C, Att. 1 at 6.  However, due to Jensen's complaints regarding Brown, Defendant Captain R. Robinson conducted an administrative review of Jensen's administrative segregation placement.  Id.  In Robinson's

report to the MCSP warden, Robinson stated that Jensen claimed that Remaley "squeezed" Jensen's arm when Remaley took Jensen from R&R to Facility A. Id. Robinson also wrote that Jensen did not cooperate with Brown because Jensen had included Brown as a defendant in another lawsuit and that Jensen continued to complain about staff, including the staff responsible for the administrative segregation facility. Id. at 6-7. Because of the lawsuit, Robinson ordered a second interview with Jensen. Id. at 6. Robinson concluded that it was Jensen's "confrontational demeanor" that was responsible for his many complaints. Id. at 7. He recommended an administrative review, as well as Jensen's transfer from MCSP while the matter was being investigated. Id.

On June 12, 2000, Jensen filed another grievance, this time complaining about his placement in administrative segregation. Id., Ex. A, Att. 1 at 71. He requested to be moved out of administrative segregation back into the prison population, to have his work/privilege group status restored, and to have his property returned. Id. The grievance was denied at each of the three administrative levels. Id. at 75-81.

Pursuant to Robinson's order for a second interview, Defendant Lt. E. Reyes conducted a second interview with Jensen on June 13, 2000. Id., Ex. C, Att. 1 at 6. Reyes videotaped the interview. Id. at 8. In the interview Jensen complained that Remaley physically and verbally assaulted him. Id. He claimed the bruising was caused by Remaley "squeez[ing] the inside of [Jensen's] arm with excessive force." Id.

On June 28, 2000, Jensen was approved for housing in Facility A. Id., Ex. A, Att. 1 at 94. He was also approved for double-cell

ORDER

C:\WINDOWS\Temp\notes101AA1\~7902209.wpd

status. Id. Jensen requested a particular individual as a cell mate, and the prison committee told him that arrangements would be made to accommodate his request but that there were no guarantees. Id.

Related to these incidents, as well as the current law suit, Jensen complains to the Court about his work/privilege group status. When Jensen was transferred to MCSP, he was in Work/Privilege Group A-1-A. Id. at 53. An inmate in Group A-1 receives one day of time credits for each day served. Cal. Code Regs. tit. 15, § 3044(b)(2). As a result of his placement in administrative segregation, Jensen was placed in Work/Privilege Group D-1-D, effective June 7, 2000. Docket No. 74, Ex. A, Att. 1 at 83. An inmate in Group D-1 earns one day of time credits for every two days served. Cal. Code Regs. tit. 15, § 3044(b)(6). The June 28 committee reviewed Jensen's D-1-D status upon their approval of his housing in Facility A and placed him in Work/Privilege Group A-2-B. Docket No. 74, Ex. A, Att. 1 at 94. Jensen was placed in Group A-2, which is the designation for inmates awaiting a full-time work or training assignment, apparently because the committee also placed him on the waiting list for a support services position. Id. at 94. Inmates in Group A-2 receive one day of time credits for every two days served. Cal. Code Regs. tit. 15, § 3044(b)(3). However, the same committee also granted Jensen S-time credits from May 30 to June 6, 2000. Docket No. 74, Ex. A, Att. 1 at 94. S-time credit may be awarded to an inmate who is placed in administrative segregation after the inmate has been held to not be responsible for the placement. Cal. Code Regs. tit. 15, § 3045.3(b)(4). An inmate receiving S-time

ORDER
C:\WINDOWS\Temp\notes101AA1\~7902809.wpd

credit earns one day of time credits for each day served as though they were in Group A-1. Cal. Code Regs. tit. 15, § 3045.3(a). A subsequent annual review committee upheld Jensen's Group A-2-B status on July 26, 2000, because Jensen was appealing the classification. Docket No. 74, Ex. A, Att. 1 at 95. The committee noted that were Jensen's appeal successful, then appropriate S-time credit would be awarded to him. Id. Jensen's appeal was apparently unsuccessful, and a later annual review committee also retained the Group A-2-B status in July 2001. Id. at 96.

And finally, in what appears to be an unrelated incident, in June 2001 Jensen complained to Defendant R. Savage that he received a half of a sheet at the laundry exchange. Id. at 100. When his cell was searched, guards found two half sheets. Id. Jensen was charged with a disciplinary violation for destruction of state property. Id. at 101–02. However, the charge was reduced and Jensen only "counseled and reprimanded" because there was no proof that Jensen had actually torn the sheets. Id. He lost no time credits as a result. Id.

Jensen's allegations stem from the above incidents. First, he claims that Remaley used excessive force in moving him from R&R to Facility A. Second, he alleges cruel and unusual punishment related to Remaley's conduct and Jensen's subsequent placement in administrative segregation. Third, he alleges retaliation by a number of Defendants as part of a large conspiracy against him. Fourth, he alleges a number of what are presumably due process violations against various Defendants for loss of good-time credits. Finally, he alleges that his constitutional rights were violated when he was issued the disciplinary citation for

destruction of state property.  Defendants move for summary judgment on all of Jensen's claims.

## DISCUSSION

The standards for summary judgment are well settled.  Federal Rule of Civil Procedure 56 dictates that "[a] party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may . . . move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof."  Fed. R. Civ. P. 56(a); see also Fed. R. Civ. P. 56(b) (providing the same standard for parties defending a claim). Summary judgment is appropriate if the Court finds that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). The Court will construe all evidence and draw all evidentiary inferences in favor of the nonmoving party.  10A Charles Alan Wright et al., Federal Practice & Procedure § 2727, at 459 & n.5 (3d ed. 1998) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970)).

A dispute over a "genuine" material fact exists if the evidence would allow a reasonable fact-finder to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. at 247–48.  The nonmoving party may defeat the summary judgment motion by producing

sufficient specific facts to establish that there is a genuine issue of material fact for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  However, mere allegations of factual dispute, without more, will not defeat an otherwise proper motion.  Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1981) ("A motion for summary judgment cannot be defeated by mere conclusory allegations unsupported by factual data.").  With these standards in mind, the Court will turn to Jensen's claims.  However, because the Court can resolve many of Jensen's claims in summary fashion, it will turn to those claims before it turns to his claim of excessive force.

**I.   Cruel and unusual punishment**

With regard to the broad claims of cruel and unusual punishment,[3] Jensen has failed to allege conduct that meets the standards under the Eighth Amendment as those standards are currently described by relevant Supreme Court and Ninth Circuit precedent.  The Supreme Court has outlined a two-part test to determine if prison officials have violated a prisoner's rights under the Eighth Amendment:

> [A] prison official violates the Eighth Amendment only when two requirements are met.  First, the deprivation alleged must be, objectively, sufficiently serious[;] a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. . . . The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.  To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind.

---

[3]   Jensen's more precise claim of excessive force against Remaley, viewed as an alleged violation of the Eighth Amendment, will be addressed separately.

ORDER

C:\WINDOWS\Temp\notes101AA1\~7902121 0 9.wpd

Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citations and internal quotations omitted); see also Wilson v. Seiter, 501 U.S. 294, 299-300 (1991) (discussing subjective requirement); Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (discussing two-part test); Osolinski v. Kane, 92 F.3d 934, 937 (9th Cir. 1996) (same); Wallis v. Baldwin, 70 F.3d 1074, 1076-77 (9th Cir. 1995) (same); Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994) (same).

With regard to the first requirement, "[t]he circumstances, nature, and duration of a deprivation of [shelter, food, clothing, sanitation, medical care, and personal safety] must be considered . . . ." Johnson, 217 F.3d at 731. "The more basic the need, the shorter the time it can be withheld." Hoptowit, 682 F.2d at 1259. Deprivation of basic necessities for even brief periods can constitute a violation whereas more moderate deprivations must be more lengthy or ongoing. Johnson, 217 F.3d at 731-32.

As to the second requirement, the relevant state of mind is "one of 'deliberate indifference' to inmate health or safety . . . ." Farmer, 511 U.S. at 834. To show deliberate indifference, the inmate must prove that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. "Thus, Farmer[] requires an inmate to show that the official knew of the risk and that the official inferred that substantial harm might result from the risk." Wallis, 70 F.3d at 1077. The "prison official need not have acted 'believing that harm actually would befall an inmate; it is enough that the official acted . . . despite his knowledge of a

substantial risk of serious harm.'" Id. (quoting Farmer, 511 U.S. at 842) (omission in original). The question of the official's knowledge is a question of fact. Farmer, 511 U.S. at 826.

Jensen's claims fail to outline a violation of the Eighth Amendment. He does not allege deprivations of life's necessities or a deprivation of anything that would be cognizable under the Eighth Amendment. His placement in administrative segregation was a product of his allegations against Remaley. When he was evasive about who caused his injuries, it was reasonable for prison officials to place him in administrative segregation. Moreover, placement in administrative segregation, without more, does not describe a violation of the Eighth Amendment. Simply put, administrative segregation does not violate the per se rights of an inmate. See Sandin v. Conner, 515 U.S. 472, 484 (1995). Jensen must establish that the conditions independently violate the Eighth Amendment in that they did not meet "the minimal civilized measure of life's necessities." See Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996). His allegations fail to meet this standard.

**II.     Retaliation**

Retaliation for the exercise of constitutional rights is itself a constitutional violation. See generally Rizzo v. Dawson, 778 F.2d 527, 531-32 (9th Cir. 1985). To make out a claim of retaliation, Jensen must "allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline." Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir. 1994). The plaintiff must further plead facts showing that retaliation for the exercise of

ORDER

C:\WINDOWS\Temp\notes101AA1\~79 21230 9.wpd

protected conduct was the "substantial" or "motivating" factor behind a defendant's conduct. Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). Such claims must be more than speculative or hypothetical; a prisoner must "allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights." Frazier v. Dubois, 922 F.2d 560, 562 (10th Cir. 1990). In evaluating the claimed retaliation, courts must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995).

Jensen's allegations fail to outline a cause of action for retaliation. He claims that Defendants placed him in administrative segregation because he filed a grievance against Remaley for excessive force. But Defendants convincingly point to a legitimate penological goal—namely Jensen's personal safety—as the reason for Jensen's placement. Jensen alleged that he was assaulted. Prison officials responded with an official investigation approved by MCSP's warden. Initially, Jensen refused to name who assaulted him, saying only that prison officials were responsible. Defendants maintain that his placement in administrative segregation under the circumstances was reasonable. The Court agrees. If indeed "unknown" prison officials assaulted Jensen, then it is imminently reasonable that other officials charged with his safety would want to isolate Jensen until the matter was resolved.

Jensen fails to plead facts that show retaliation was a "substantial" or "motivating" factor behind any of Defendants'

conduct.  He admits that in his initial interview with Brown, he did not identify his attacker.  It was only after the initial interview that Jensen alleged that Remaley assaulted him.  The majority of Jensen's allegations claiming retaliation describe a vast conspiracy against him.  But the only claims of any import, in the Court's view, are the alleged statements of Defendant Carrillo.  Jensen claims that Carrillo told him that if Jensen did not mention Remaley's name in connection with the alleged assault or if Jensen signed a waiver, then Jensen would not be placed in administrative segregation and maybe "they could forget about 'the whole thing.'"  Even assuming Carrillo made such statements, it was not Carrillo who was responsible for Jensen's administrative segregation placement.  Instead, it was Defendants Brown and Robinson that were responsible.  And, there is no evidence or allegation that Carrillo acted at Brown's or Robinson's behest.  Brown simply interviewed Jensen about the incident.  When Jensen was evasive about his alleged attacker's identity, Brown recommended administrative segregation.  Robinson agreed and eventually had Reyes interview Jensen.  Based on the results of these interviews, as well as his investigation, Robinson thought it prudent to keep Jensen in administrative segregation.

Further, it is clear that the administrative segregation lasted only as long as it took to sort out Jensen's allegations.  He was released after spending only twenty-one days in administrative segregation.  Jensen was placed in administrative segregation when he refused to state who assaulted him.  Once prison officials were satisfied that his allegations were baseless, he was approved for housing back in Facility A.

ORDER
C:\WINDOWS\Temp\notes101AA1\~7902125 0 9.wpd

Equally unconvincing is Jensen's allegations against Dr. Bulanon and Lt. Brown. Jensen faults them for refusing to change their earlier reports to reflect that he had identified Remaley as his attacker. But he admits that he was evasive when asked about the cause of his injuries. His claims against these Defendants are frivolous.

**III.     Good-Time Credits**

Jensen requests that any good-time credits he lost be restored. He faults Defendants Johnson, Martinez, and Iturreria for failing to correct his work/privilege group status. Docket No. 7 at 16. But as the State correctly points out, the Ninth Circuit has made it clear that prisoners have no constitutional rights to a work assignment or particular security classification. See Toussaint v. McCarthy, 801 F.2d 1080, 1094-95 (9th Cir. 1986); Coakley v. Murphy, 884 F.2d 1218, 1220-21 (9th Cir. 1989). Even were he to have such a liberty interest, a claim as to the proper accumulation of those credits must be brought in an action for habeas corpus rather than a § 1983 civil rights suit. See Preiser v. Rodriguez, 411 U.S. 475, 500 (1973); see also Young v. Kennyi, 907 F.2d 874, 875-78 (9th Cir. 1990). His claims for good-time credits will be dismissed without prejudice to their renewal in an action for habeas corpus.

**IV.     Destruction of state property citation**

Jensen alleges that Defendant Savage violated his constitutional rights when Jensen was issued the citation for destruction of state property. Docket No. 7 at 17. This claim is frivolous. First, in his opposition Jensen admits that Savage was not even the officer that issued the citation. Docket No. 75 at 9.

In fact, it appears that Officer K. Clendenin was the prison official responsible for the citation.  Docket No. 74, Ex. A, Att. 1 at 101.  Second, Jensen suffered no disciplinary action as a result of the filing.  He does not dispute that the citation was reduced to a verbal counseling chrono and that he lost no time credits as a result.  Finally, it is clear from Jensen's complaint that the genesis for Jensen's grievances regarding Savage are not in the citation but rather in other alleged comments by Savage that portrayed Jensen as a "jerk" to other inmates such that other inmates would not want Jensen as a cellmate.  Docket No. 7 at 17.  Jensen's claims are frivolous and cannot form the basis for a § 1983 suit.  See Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) ("[V]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983.") (quoting Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979)).

**V.   Excessive Force**

As related above, Jensen accuses Remaley of using excessive force and other prison officials of not taking sufficient remedial action.  In examining Jensen's claim, the Court must determine whether the force used was such that it violated the Eighth Amendment's prohibition against cruel and unusual punishment.  In short, the Eighth Amendment prohibits prison officials from using "excessive physical force against inmates."  Farmer, 511 U.S. at 832.  The basis for determining liability is the same two-part test outlined by the Farmer court and described above.  However, in excessive force cases, a higher degree of culpability is required.  Madrid v. Gomez, 889 F. Supp. 1146, 1247 (N.D. Cal. 1995).  The core judicial inquiry is "whether force was applied in a good-faith

effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)). Toward that end, it is "obduracy and wantonness," as opposed to "inadvertence or error in good faith," that characterizes excessive force in the prison context. Whitley, 475 U.S. at 319.

In performing the above analysis, the Court must take note that decisions undertaken by prison officials, who are charged with the safety of prison staff, other prisoners, and visitors, are often "made in haste, under pressure, and frequently without the luxury of a second chance." Id. at 320. To aid the analysis, the Supreme Court has identified five factors courts should take into consideration: "(1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between that need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response." Madrid, 889 F. Supp. at 1247 (citing Hudson, 503 U.S. at 7, and Romano v. Howarth, 998 F.2d 101, 105 (2nd Cir. 1993)). The extent of a prisoner's injuries can only form the basis of dismissal if the injuries are "de minimis." Hudson, 503 U.S. at 9-10.

Fortunately for the Court in this case, the facts leading to Jensen's injuries are not in dispute. Jensen and the State appear to materially agree to the facts that lead up to Remaley's confrontation with Jensen; their disagreement centers more on the legal characterization of Remaley's actions. After examining the parties' respective positions, the Court is satisfied that Jensen's allegations do not rise to the level of an Eighth Amendment

violation. Jensen does not dispute the State's contention that he was verbally belligerent with prison officials. He also does not dispute that he refused to cooperate with officers after repeated requests to do so or that he tried to push past Officer Remaley on two occasions. According to the parties' respective accounts, Remaley then grabbed Jensen by the arms, spun Jensen around, and placed handcuffs on him.

Jensen's claims then boil down to his allegations that Remaley "squeezed" his arms too hard. While the Court can certainly appreciate the fact that Remaley's actions may have been painful, they do not amount to a violation of the Eighth Amendment. Remaley was acting in a fluid environment with an uncooperative prisoner. Jensen does not accuse Remaley of beating or hitting him. The handcuffs Remaley placed on Jensen were apparently not tight enough to cause injuries. The bruising on Jensen's arms is consistent with the facts in that there were no other injuries to Jensen's body that would indicate Remaley or anyone else struck Jensen.

The Court's conclusion that Jensen's claims do not rise to the level of an Eighth Amendment violation and that his injuries are de minimis is supported by the Supreme Court's Hudson decision. In that case, the prisoner was hit with blows that "caused bruises, swelling, loosened teeth, and a cracked dental plate." Hudson, 503 U.S. at 10. The Supreme Court therefore held that the prisoner's injuries were not de minimis and reversed the Fifth Circuit's decision to the contrary. In this case, Jensen was not struck with any blows. His injuries were caused by Remaley grabbing Jensen in order to secure him. The injuries consisted of bruising located on

Jensen's arms. The Court is satisfied that such circumstances do not describe a violation of the Eighth Amendment.

Accordingly, the Court will dismiss with prejudice Jensen's claims against Remaley. Because Jensen's excessive force claims do not amount to a violation of the Eighth Amendment, it necessarily follows that his claims against other prison officials for failing to prevent what he terms Remaley's excessive force must also fail. These claims will be dismissed as well.

In short the Court is persuaded, as outlined above, that all of Jensen's claims fall short of the required standards. Accordingly, the State is entitled to summary judgment. In addition, the Court has already dismissed Jensen's other case before it, Jensen v. Knowles, et al., CIV S-02-2373 (E.D. Cal. Oct. 29, 2002), in an order dated July 25, 2005. There being no case to consolidate and given the Court's decision in this case to grant the State's motion for summary judgment, Jensen's motion to consolidate will be denied as moot.

**IT IS THEREFORE ORDERED:**

The motion to consolidate at **Docket No. 77** is **DENIED AS MOOT**. The motion for summary judgment at **Docket No. 73** is **GRANTED**.

Dated at Anchorage, Alaska, this   10th   day of August 2005.

/s/ James K. Singleton, Jr.
**JAMES K. SINGLETON, JR.**
United States District Judge

ORDER
C:\WINDOWS\Temp\notes101AA1\~7902220 09.wpd